Gary D. PIGNATO, Plaintiff–Appellant,

v.

**AMERICAN TRANS AIR, INC.,**
Defendant–Appellee.

No. 92–3685.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1993.

Decided Jan. 19, 1994.

[black bar]

Steven M. Levin (argued), Levin & Perconti, Chicago, IL, for plaintiff-appellant.

Michael L. Tinaglia, Laser, Schostok, Kolman & Frank, Chicago, IL, Gregory J. Utken, Alan L. McLaughlin (argued), Baker & Daniels, Indianapolis, IN, for defendant-appellee.

Before POSNER, Chief Judge, CUDAHY and KANNE, Circuit Judges.

KANNE, Circuit Judge.

American Trans Air (ATA) is an air carrier which operates both charter flights and scheduled passenger service. Gary Pignato was an employee of ATA from December, 1985 to December 1990. Throughout the period of his employment with ATA, Pignato was also a member of the Indiana Air National Guard.

Pignato contends that ATA acted against him illegally in three ways: (1) by firing him in 1987; (2) by denying him an "upgrade" to a better job in 1989; and (3) by firing him again, and finally, in 1990. Pignato bases his claims against ATA on two statutory provisions of the Vietnam Era Veterans' Readjustment Assistance Act.[1]

I.  Facts

ATA operates several B–727 aircraft, which make a total of approximately 400 flights per month. Each B–727 has a crew of three; a captain, a first officer,[2] and a flight engineer. Pignato was hired in 1985 as a B–727 flight engineer. In January of 1989 he was promoted to B–727 copilot.

Flight assignments for B–727 crew members are made by a bidding process, which is repeated each month. On or about the fifteenth of the month each crew member is given a "crew bid sheet" which contains eight to ten "lines" to choose from. A line is a monthly schedule of days when the employee will be required to fly, days where he must be available to fly if needed, and other days on which he might be called on to fly, and several guaranteed days off. These guaranteed days off are called "G-days."

Crew members submit a list of lines in order of preference. Lines are assigned by seniority. If, for example, two copilots listed the same line as their first choice, the more senior copilot would be awarded the line.

Pignato had to accommodate his flying schedule for ATA with his commitment to the Guard. The Guard's training requirements included, typically, Unit Training Assemblies (UTAs) one weekend per month, annual 15 day training periods, and 48 four hour training periods. In Pignato's case, his Guard commitment was usually four or five days per month. The Guard notifies its members twelve to eighteen months in advance of the date of the annual training period. Each summer it publishes the dates for UTAs for the following calendar year. The four hour training periods may be scheduled at virtually any time. Pignato always had many months of advance notice, or great flexibility, as to his Guard flying schedule.

ATA requires its employees who are members of the Guard to perform their military obligations on their G-days. They are required to bid for lines which do not conflict

---

1.  38 U.S.C. Section 2021(b)(3) provides:
    Any person who seeks or holds a position [in private employment] shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a reserve component of the Armed Forces.
    38 U.S.C. Section 2024(d) provides:
    Any [military reservist] shall upon request be granted a leave of absence by such person's employer for the period required to perform active duty for training or inactive duty train-

ing in the Armed Forces of the United States. Upon such employee's release from a period of inactive duty training ..., such employee shall be permitted to return to such employee's position with such seniority, status, pay, and vacation as such employee would have had if such employee had not been absent for such purposes.

2.  To be consistent with the parties' characterizations in their briefs, we use the term "copilot" rather than "first officer" throughout the remainder of this opinion.

with training commitments. As we have noted, Guard commitments are announced many months in advance. If there is an unavoidable conflict, the employee is to notify ATA as soon as he is aware of a conflict.

Pignato's situation was not unique. Many ATA aircrew are members of Air Force Reserve units. Very few of these individuals have found it difficult to comply with ATA's rules. Conflicts between the two schedules rarely arise.

Nonetheless, on numerous occasions Pignato bid for lines which conflicted with his military obligations. He then informed ATA of conflicts long·after he first became aware of them. Pignato apparently believed that ATA had to allow him to fly for the Guard, and could impose no requirements on him to accommodate this service with his work requirements. In particular, he did not want to use his personal time to fly for the Guard. He wanted his Guard flying time to come out of time he would otherwise be flying for ATA.

Pignato's unwillingness to notify ATA of his Guard flying commitments in advance forced ATA, on several occasions, to find a replacement crew member at the last minute. Pignato was repeatedly warned to comply with ATA's policy regarding scheduling.

On April 15, 1987 ATA fired Pignato because he bid for a line with two known conflicts, in violation of ATA's flight scheduling policies. Pignato responded by filing a complaint with the Department of Labor alleging that ATA had terminated him because of his military status, and demanding reinstatement and backpay. Pignato's claim was found to be meritless. ATA rehired Pignato several months later, amending his file to indicate that the period of his termination was a leave of absence without pay.

In January of 1989 Pignato was promoted to B–727 copilot. In October of that year he asked to be assigned to a class to be trained as a copilot on the B–757, a new airplane which ATA was adding to its fleet. An "upgrade" to copilot on the newer B–757 would have included about a fifteen percent increase in Pignato's pay.

In April of 1990 Pignato filed a *pro se* complaint against ATA for, among other things, failing to train him as a B–757 copilot. In October of 1990, ATA assigned Pignato to a training class for the B–757. Pignato was scheduled to complete his training as'a B–757 copilot on December 17, 1990. His final requirement was to fly as an observer on a B–757 that day. Pignato did not make the flight.

Pignato called ATA twice that day. During his first phone call Pignato asked to be relieved of his flight duty for the day. He offered three reasons for his request: (1) that he was "stressed out" due to his·ongoing divorce proceedings, (2) that there was a second pilot scheduled to receive training on the same flight, so that his presence would be redundant, and (3) that he wanted to attend the ATA Christmas party. His request was denied.

Pignato then called a second time. He said that he was sick, claiming that he was under too much stress to fly. That same day Pignato got a note from a social worker, Mark Frey, which indicated that Pignato was being counselled by him. The note did not indicate that Pignato was unable to perform his duties.

Despite Pignato's alleged stress, he was able to relax sufficiently by that evening to attend the ATA Christmas party. He stayed at the party until midnight. He got drunk. When the party ended Pignato was too drunk to drive, so he went in an other person's car to the home of three female ATA employees. There the festivities continued for the remainder of the night. Pignato returned home the next day, and despite the celebratory exertions of the previous evening and early morning, Pignato called in to ATA that he was now "well."

Pignato's "stress" had apparently subsided by December 20 and 21, because he flew for the Guard on those dates. He took no further action regarding the "stress" which kept him from working on December 17.

ATA requested Pignato's appearance at company headquarters on December 31, 1990. He met with representatives of the company, who terminated him. The reasons

given for his termination were "abuse of the sick day policy, representing manipulation of the scheduling system for personal convenience."

Captain Cooper, Pignato's superior at ATA, attended the December 31 meeting. During the meeting he made the decision to terminate Pignato. Cooper found the letter from Mark Frey to be irrelevant to his decision because it did not state that Pignato was incapable of performing his duties. Furthermore, at the December 31 meeting, Cooper claims that Pignato himself stated that he was capable of performing his duties on December 18. Pignato had used a "sick" day to excuse himself from working when he was not, in fact, sick. This was a violation of ATA's policy.

ATA had a policy of "progressive discipline" which generally required penalties of increasing severity for repeated misconduct. Termination is, of course, the ultimate sanction for an unsatisfactory employee. However, Cooper characterized Pignato's actions as "an episode of gross misconduct" and "a serious demonstration of irresponsible behavior." Because he found Pignato's offense to be so serious, Cooper did not first impose a lesser sanction, but fired him on the spot.

Pignato filed a claim with the Illinois Department of Employment Security. A hearing was held before a referee on February 14, 1991, at which both Pignato and ATA testified. The referee found that Pignato had abused ATA's sick leave policy, and upheld ATA's termination of Pignato. The Employment Security Review Board upheld this decision on July 18, 1991.

Pignato then filed a *pro se* action against ATA in federal court. In September 1991 the district court denied ATA's motion for summary judgment, finding that there were contested issues of fact regarding the 1987 termination. Pignato then retained counsel, who took the case to trial. After a three day bench trial the trial court found for ATA on all counts.

Pignato filed a timely notice of appeal. This court has jurisdiction under 28 U.S.C. § 1291.

## II. Standard of Review

Pignato claims that ATA discriminated against him because of his military reserve status. The district court found to the contrary. We have held that "a finding of intentional discrimination is a finding of fact." *Tyson v. Jones & Laughlin Steel Corp.*, 958 F.2d 756 (7th Cir.1992) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). Therefore, the appropriate standard of review is clear error. *Id.*, Fed.R.Civ.P. 52(a). We find a clear error when we are left "with a definite and firm conviction that a mistake has been made." *Id.* When applying this standard we recognize the discretion which the trial judge must have to weigh testimony and other evidence, and to determine which version of the facts is correct. *Id.* See also *Yowell v. United States Postal Serv.*, 810 F.2d 644, 648 (7th Cir.1987).

## III. Analysis

In *Yowell* we discussed the rules governing burden of proof, burdens of production and the sequence of proof which has been developed for Title VII cases. In *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 657 (7th Cir.1991) we extended the methodology of Title VII discrimination cases to cover age discrimination. Cases involving discrimination against a class of persons protected by a different statute, as in this case a military reservist protected by the Vietnam Era Veterans' Readjustment Assistance Act, must follow essentially the same steps.

The plaintiff bears the burden of proof throughout the case. First, plaintiff must establish his prima facie case of intentional discrimination by offering evidence to raise an inference that the plaintiff was discharged, or otherwise mistreated, because he belonged to a protected group. Second, once plaintiff has established a prima facie case, the burden of production shifts to the defendant to "articulate a legitimate nondiscriminatory reason for the employee's removal." Third, plaintiff then has the opportunity to demonstrate that the defendant's articulated reason for terminating him is "a mere pretext for discrimination." This demonstration "merges with [plaintiff's] ultimate burden of

showing that the defendant intentionally discriminated against the plaintiff." *Id.* 810 F.2d at 647.

■ The district court, in its Memorandum Opinion and Order of September 26, 1991 denied ATA's motion for summary judgment, finding that there were genuine issues of fact as to whether ATA "discharged or otherwise disadvantaged" Pignato solely because of his military obligations. We have held that where a case has survived a motion to dismiss or for summary judgment, and has been fully tried on the merits, that the "reviewing court should [not] concentrate on the issue of whether the plaintiff has established a prima facie case." *Andre v. Bendix Corp.,* 774 F.2d 786, 792 (7th Cir.1985), (citing *U.S. Postal Serv. v. Aikens,* 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983)). Therefore, despite certain apparent weaknesses revealed by the record in Pignato's prima facie case we leave without further comment the district court's finding that he had established it.

We must now examine the next two steps in an employment discrimination case: ATA's proffered reasons for its alleged mistreatment of Pignato, and Pignato's attempt to demonstrate that those reasons are not true but are pretexts for discrimination.[3]

There were three distinct job actions by ATA which Pignato claims were discriminatory. First, Pignato claims that he should have received back pay for the period during which he was fired in 1987. Second, Pignato claims that ATA refused to "upgrade" him due to his Guard commitment. Third, Pignato claims that ATA fired him in December 1990 because of his Guard commitment.

■ The district court found against Pignato, and we will only reverse if we find clear error. We will not reweigh the credibility of witnesses, *Smith v. BMI, Inc.,* 957 F.2d 462, 463 (7th Cir.1992), or find clear error where the district court drew one of several possible inferences from the evidence before it. *Tyson v. Jones,* 958 F.2d 756, 760 (7th Cir. 1992). We will examine each of the challenged actions separately, in the order they occurred.

### The 1987 Termination

■ Pignato claims that he should have received back pay for the period during which he was fired in 1987. The district court found that Pignato had settled his claim against ATA, and therefore could not re-raise it.

Pignato's 1987 claim against ATA sought back pay. However, ATA's offer of reinstatement excluded back pay, but modified his employment record to indicate that he was on unpaid leave, not terminated. Pignato returned to work following this offer.

Pignato claimed that he had never accepted reemployment without back pay. ATA offered evidence that Pignato *had* accepted reemployment without back pay.

The district concluded that Pignato knew what ATA's offer was, and accepted it by returning to work. The evidence in the record more than adequately supports the district court's conclusion that Pignato accepted ATA's settlement offer. Pignato has settled any claims arising from the 1987 termination and may not raise them now.

We find no error on this issue.

### The Denial of a Job Upgrade

■ In October 1989, Pignato asked to be assigned to a pilot-training class for ATA's new B–757 aircraft. Pignato claims that ATA initially denied his request for an upgrade to B–757 copilot because of his reserve status. ATA claimed that Pignato was not initially upgraded because it believed that he needed more training and flight experience, that he had only recently been promoted to

---

**3.** The Supreme Court recently addressed the standard of proof plaintiffs must meet to prevail in employment discrimination claims, once they have cleared the hurdle of putting on a prima facie case. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *St. Mary's* holds that plaintiff does not prevail as a matter of law merely by showing that the employers stated reason for its action was false.

In this case, Pignato failed to rebut ATA's explanation for its actions, so we do not reach the issue implicated by *St. Mary's.* We fully discuss this issue in our recent opinion, *Anderson v. Baxter Health Care Corp.,* 13 F.3d 1120 (7th Cir. 1994).

B–727 copilot, and that other more experienced personnel were better candidates. The district court concluded that ATA's decision not to upgrade Pignato until one year after his initial request was not based on his reserve status.

Pignato and ATA disagree about the facts pertaining to ATA's denial of the upgrade. For example, Pignato's proficiency as a pilot was assessed in a "check ride" in November of 1989. He was observed by an ATA employee, Captain Leonard. Leonard testified that Pignato's performance was below average. Pignato claims that he was told at the time that his check ride was satisfactory.

Later that same month, Pignato met with an ATA supervisor to discuss his ongoing military leave dispute with ATA. Pignato claims that he was "outraged and surprised" to later learn that ATA considered his performance on the check ride to be unsatisfactory. Pignato claims that the written report he had been shown after the check ride had been falsified. He claims that this change was made by ATA to penalize him for continuing to argue against ATA's policy on scheduling Guard flying commitments.

At trial Pignato offered only his own, uncorroborated testimony that the document had been changed, and that he had previously been unaware that ATA had considered his check flight to be unsatisfactory.

Not only do the parties disagree on what actually happened during the November 1989 check ride. They also disagree on its significance. Pignato constructs an argument which goes roughly as follows: (1) ATA claimed that it relied on the November 1989 check flight when denying him the upgrade, but that (2) it had already denied him the upgrade before the flight, so (3) ATA lied about its motive, so (4) its true motive must have been discrimination against Pignato because of his military status.

However, the first link in the chain won't hold. ATA's testimony is that it did *not* rely on the 1989 check ride. ATA admits that it denied Pignato the upgrade *before* the flight. ATA's explanation is that it denied the upgrade because of Pignato's lack of experience relative to the other pilots who applied for

the upgrade. Once Pignato's misstatement of the record is corrected, this argument dissolves.

Pignato also tries to show ATA personnel without Guard commitments were unfairly favored. He points out that two other relatively inexperienced pilots, Kaiser and Ledray, were upgraded before he was. He asserts that this is evidence of discrimination. ATA gave credible reasons why each of them was upgraded before Pignato. Kaiser had been with ATA longer, had more experience than Pignato, and had certain relevant special expertise. Ledray had an "unblemished" flight record. Though he had about the same level of experience as Pignato, he was allowed to enter the program before Pignato. Only one inexperienced pilot was allowed in at a time. When Ledray's group completed their training, Pignato was upgraded.

On the issue of denial of an upgrade, the trial court was faced with rival explanations for the same set of facts. It had to decide whose story it was to believe. This was a bench trial. There were many witnesses, and full opportunity for direct and cross-examination. At the end of the day, the district court believed one set of witnesses, and not the other. It heard them testify, and it assessed their credibility. It concluded that ATA's explanation for its conduct was not a pretext for discrimination.

Pignato's challenge to this finding is based primarily on citations to his own testimony, which is contradicted by the testimony of witnesses for ATA. In *Tyson v. Jones,* 958 F.2d 756, 760 (7th Cir.1992), we stated that when the appellant asked us to "redetermine the credibility of the [employer's] witnesses, and presumably his own" he was "asking us to do precisely that which we may not." *Id.* Pignato, too, is asking us to do what we may not do.

We cannot find clear error on this issue. We uphold the district court's finding that ATA's initial refusal to upgrade Pignato was not discriminatory.

*The 1990 Termination*

▮ We have already set out the facts surrounding Pignato's final termination, above. From these facts he constructs an

argument that he is a victim of employment discrimination. Pignato's argument, briefly, is this: (1) There was an ongoing dispute between Pignato and ATA regarding his flying schedule for the Guard. (2) No rational employer would have fired Pignato for his conduct on December 17, 1992. So, (3) ATA must be lying about its reason for firing him—and (4) therefore its real reason must be its dispute about his Guard flying schedule. And finally, (5) being fired because of a disputed Guard flying schedule is a form of illegal employment discrimination.

Pignato demonstrated that at the time he was fired there was an ongoing disagreement between ATA and himself about reconciling his Guard flying schedule with his job schedule. The existence of this ongoing problem is undisputed.

Pignato then attempted to demonstrate that ATA cannot be taken seriously when it claims it fired him because of his conduct on December 17, 1990. He argues that firing him for the reasons ATA stated would be irrational. He asks, "[w]hat rational employer fires a five year veteran employee, highly trained, at considerable expense, who had no prior disciplinary infractions, for taking a sick day that was supported by a doctors note?"

Of course, Pignato did not really "take a sick day." He was not sick, he could have flown if he wanted to, and he violated ATA's rules for "taking a sick day." Nor did he have a "doctor's note." He had a note from a social worker which did not even say he was unable to work. As to being a veteran employee, and expensively trained, a reasonable employer might expect such a valued employee to act like a highly trained professional with serious responsibilities. A rational employer might very well fire an employee who refused to show up for work when he was scheduled to work, who thereby caused inconvenience and expense to other employees and the company, who then made up an excuse for his absence, and who flaunted his lack of responsibility by getting drunk at the firm Christmas party when he was supposedly too sick to work.

It was simply not clear error for the district court to conclude that ATA's motivation for firing Pignato was Pignato's own irresponsible conduct, whatever his military status.

■ However, even if we were to conclude that ATA's decision to fire Pignato was "irrational" this would not make it a "pretext." If ATA's actual motivation was what they say it was, irrational or not, it is not a pretext.

■ It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. *Mister v. Illinois Cent. Gulf R.R. Co.*, 832 F.2d 1427, 1435 (7th Cir.1987) ("The employer need not have 'good' reasons, and a mistaken business decision is not on that account a 'pretext'."). He must show that the explanation given is "a phony reason." If the plaintiff shows that the reason given is *not true*, then he has shown pretext. Having done so, the trier of fact is allowed to infer that the falsehood was meant to conceal illegal job discrimination. *Anderson v. Baxter*, 13 F.3d 1120 (7th Cir. 1993), *Visser v. Packer Eng'g Assocs.*, 924 F.2d 655 (7th Cir.1991).

Pignato failed to prove that ATA's explanation for its decision to terminate him was pretextual. Therefore, no inference of discrimination is allowed. The district court's finding that ATA's explanation was true, i.e. not pretextual, was not clear error.

■ Furthermore, even if ATA's decision was in some part influenced by their ongoing difficulties with Pignato's schedule, this would in no way help his cause. "[T]he mere existence of mixed motives—one permissible, one forbidden—is not enough to establish liability. The forbidden motive, [military status] in this case, must be a sufficient condition, or but-for cause, of the employee's termination." *Visser*, 924 F.2d at 658. Pignato, failed to prove that ATA's proffered reason for his termination was pretextual. ATA's explanation was therefore found to be, if not the sole reason, at minimum a significant motivation for his firing. Therefore any influence his ongoing job dispute may have had on the decision was not a "but-for cause."

■ Finally, Pignato's unwillingness to comply with ATA's policy regarding military

flight commitments, even if it was in any part a basis for his termination, is distinct from his military status itself, and not protected by law. The Supreme Court interpreted the statute upon which Pignato has brought this case in *Monroe v. Standard Oil Co.*, 452 U.S. 549, 561, 101 S.Ct. 2510, 2517, 69 L.Ed.2d 226 (1981). The Supreme Court held that the statute did not "impos[e] an obligation on employers to provide a special work scheduling preference" for reservists. Rather, "the legislation stated explicitly that reservists were to be entitled 'to the same treatment afforded their co-workers not having such military obligations....'." *Id.*

Pignato was seeking a "special work scheduling preference" not only different from his non-military coworkers, but from his military coworkers as well. Many ATA employees fly for the Guard. They, apparently, manage to combine that service with their work for ATA.

At bottom, what Pignato wanted was for any and all inconveniences of his Guard service to fall on ATA, and none on himself. But this is not what the law, as set forth in *Monroe*, requires. Pignato has no right to any such special treatment.

It was not clear error for the district court to reject Pignato's claim that his final termination by ATA was a result of his reserve status. As the district court correctly stated, "[w]hether ATA's judgment of Pignato's conduct was right, wrong, or harsh is not the test. It was not pretextual."

AFFIRMED.