# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued September 7, 2007          Decided October 30, 2007

No. 05-5415

HARVEY L. PATTERSON,
APPELLANT

v.

STEPHEN L. JOHNSON, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
APPELLEE

―――――

Appeal from the United States District Court
for the District of Columbia
(No. 02cv02213)

―――――

*Ellen K. Renaud* argued the cause for appellant.  With her on the briefs was *Richard L. Swick*.  *David H. Shapiro* entered an appearance.

*Oliver W. McDaniel*, Assistant U.S. Attorney, argued the cause for appellee.  With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.  *Michael J. Ryan*, Assistant U.S. Attorney, entered an appearance.

Before: RANDOLPH and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Harvey L. Patterson claims that his immediate supervisor engaged in unlawful racial discrimination against him through her various interventions into Patterson's management of his division at the Environmental Protection Agency ("EPA"). He also claims that his later transfer to another position within the EPA amounted to unlawful retaliation directed against his filing and pursuit of a discrimination complaint before the EPA's Office of Civil Rights. The district court granted summary judgment for the defendant. We affirm.

\* \* \*

Beginning in 1998, Patterson, an African-American, served as Director of the Superfund/RCRA Regional Procurement Operations Division ("SRRPOD") and as a member of the EPA's Senior Executive Service ("SES"). SRRPOD is a division of the Office of Acquisition Management ("OAM"), which itself is within the Office of Administration and Resources Management ("OARM").

During the summer of 2000, Judy S. Davis, a Caucasian, became Patterson's immediate supervisor upon her promotion to Acting Director of OAM (a promotion made permanent the following year). Patterson alleges that trouble between him and Davis began almost immediately and that their relationship suffered from serious differences in management philosophy. The disparate treatment that Patterson alleges depends entirely on actions by Davis as his superior; those actions, and more broadly the interaction between him and Davis, also form the background for the allegedly retaliatory

transfer. We address the allegations of disparate treatment first, then those of retaliation.

*Discrimination claims*. These need not detain us long. As a threshold matter, Patterson first contacted an EEO counselor on February 28, 2002. His claims that are based on alleged actions taken more than 45 days earlier were not properly exhausted, see 29 C.F.R. § 1614.105(a)(1); see also *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006), so summary judgment as to those claims was clearly correct.

Patterson's remaining discrimination claims rest on evidence that Davis: (1) vetoed his hiring of clerical staff on February 25, 2002, thus usurping what he believed to be his prerogative (although she reversed that decision two days later); (2) detailed two employees out of SRRPOD in February and March 2002; (3) hired an interviewee over his objection in March 2002, and then immediately detailed that new employee out of SRRPOD; (4) failed to appoint him as Acting Director for the day of March 8, 2002; and (5) intervened in and refused to take disciplinary action regarding a case of possible theft involving one of Patterson's subordinates.

Liability for discrimination under Title VII requires an adverse employment action, *Brown v. Brody*, 199 F.3d 446, 452-55 (D.C. Cir. 1999). For the mine run of cases, we've adopted Supreme Court language, formulated in a slightly different context, and held that such adversity requires "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). This formulation doesn't seem

quite apt for a case where the gravamen of the complaint is interference with the plaintiff's managerial prerogatives. Cf. *Ohal v. Bd. of Trs. of the Univ. of the Dist. of Columbia*, 100 F. App'x 833, 834 (D.C. Cir. 2004) (per curiam) (requiring "a *material* reduction of supervisory responsibilities" (emphasis added)). In such a case, we think the interference could qualify as an adverse employment action only if it tended to materially impair the plaintiff's job performance or prospects for advancement.

Patterson provides no evidence that Davis's actions could have had any such effects. As SRRPOD Director he supervised approximately 57 employees; how the detail of just three of those subordinates to other duties might be materially adverse is not apparent. Indeed, Patterson's official evaluations classed his management of SRRPOD as "outstanding," the highest of the five possible ratings. Joint Appendix ("J.A.") 634.

Likewise, there is no evidence that materially adverse consequences to Patterson's employment could have flowed from Davis's not designating him as Acting Director of OAM for a single day, see *Taylor v. FDIC*, 132 F.3d 753, 764-65 (D.C. Cir. 1997), her veto of clerical staff hiring that she reversed just two days later, or her decision not to refer a theft case involving an SRRPOD employee for formal investigation. Patterson claims that these actions caused him to feel "undermin[ed]," J.A. 570, 577, but "'purely subjective injuries,' such as . . . loss of reputation, are not adverse actions." *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006); see also *Forkkio v. Powell*, 306 F.3d 1127, 1132 (D.C. Cir. 2002) (holding that while "supervision" may have caused an employee "subjective injury," it did not "objectively harm his working conditions or future employment prospects").

*Retaliatory transfer.* This issue requires introduction of a new dramatis persona, Morris X. Winn, an African-American who was designated as Assistant Administrator for OARM in late 2001 and confirmed and appointed to that position in February 2002. Accession to this post made him the superior of both Davis and Patterson. Shortly after Winn's designation to lead OARM, Patterson arranged a meeting with him and discussed his difficulties working with Davis and his willingness to transfer to a comparable position within the EPA. Later, in December 2001, in one of the time-barred acts of alleged discrimination, Davis cancelled an approved leave of Patterson's so that he could attend a rescheduled OAM staff meeting. This precipitated another spat between Davis and Patterson, with Patterson then calling on Winn to intervene. Shortly thereafter, on January 4, 2002, Patterson sent Winn a draft EEO complaint in order "to give [Winn] a sense of some of what I have been dealing with for the last several years, and why I feel that the cost of repairing the relationship [with Davis] is far beyond what I'm willing to pay." J.A. 645.

At about this time Winn started to consider possible transfers for Patterson, and in February 2002 offered him a new position as his own Senior Advisor. Patterson declined that offer and asked to remain at SRRPOD unless the "other options" he had discussed with Winn became available. J.A. 644. Patterson recalled that Winn "offered several different positions" to him in early 2002, but that he declined each offer because he "did not think [they] were comparable [positions]." J.A. 147. As part of an agency exercise to shift SES employees to new positions within EPA, Patterson provided EPA's Office of Human Resources and Organizational Services with a list of five positions to which he would be willing to transfer. He was told that none of those positions was available.

On June 18, 2002, Patterson contacted Winn to inform him that "schisms in OAM are deepening and intensifying" and that absent some intervention "explosions may be close at hand." J.A. 659. The next day, Patterson forwarded Winn an e-mail chain in which Patterson and Davis argued over who would be named to a temporary detail assignment—a communication that Winn labeled "More of the same." J.A. 657. Soon thereafter, Winn proposed to Patterson that he be transferred to a new position—Associate Director for Competition and Strategic Planning—that EPA was establishing within OARM's Office of Grants and Debarment. Patterson declined the offer, but Winn decided to transfer Patterson over his objection. When Winn signed paperwork creating the new position on July 3, 2002, he listed Patterson as the employee who would fill the position. Later that month, Winn formally requested Patterson's transfer and made it effective on August 1, 2002. Patterson alleges that this transfer constituted unlawful retaliation for the filing and pursuit of his EEO complaint. See 42 U.S.C. § 2000e-3(a).

We assume in Patterson's favor that the evidence made out a prima facie case of retaliation. Thus we assume that the temporal proximity of Patterson's discrimination complaint and transfer could support a jury's finding of a causal link, see *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985); Winn received official notice of Patterson's formal complaint the day before he formally created the new position for Patterson, though he had long been aware of Patterson's discrimination complaint against Davis and had long contemplated a change in Patterson's position. And we assume that the sharp reduction in supervisory responsibilities associated with the transfer—Patterson had 57 subordinates in the old position, but none in the new (at least at the outset)—could support a jury's finding that such a transfer "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*,

126 S. Ct. 2405, 2409 (2006); see also *id.* at 2415; cf. *Czekalski v. Peters*, 475 F.3d 360, 364-65 (D.C. Cir. 2007).

The remaining question is whether, in light of the justifications offered by the EPA, a reasonable jury could infer from Patterson's prima facie case and any other evidence that the transfer was a response to Patterson's protected activity rather than a result of the legitimate, non-discriminatory reasons proffered by the EPA. See *Broderick*, 437 F.3d at 1231-32.

The EPA argues that Winn transferred Patterson because he had requested to be transferred away from a supervisor with whom his relationship was admittedly beyond repair, and that the transfer responded to insistent congressional concerns and furthered a new mobility program aimed at all of the EPA's senior executives. Indeed, at their very first meeting, Patterson had asked Winn to transfer him out of OAM (and thus away from Davis's supervision) and into a comparable position elsewhere in OARM. Weeks after Patterson informed Winn of his draft EEO complaint, Winn had asked Patterson to serve as his own Senior Advisor, but Patterson declined that offer. Moreover, the position to which Winn ultimately transferred Patterson was important to the EPA. Members of Congress had long been concerned that EPA issued too few of its grants on a competitive basis, and at the time of the transfer they were demanding that EPA establish a "competition advocate" who would implement grant-making reforms then undertaken mainly on paper. Winn believed that Patterson's experience with procurement contracts made him uniquely qualified for the task. Finally, Winn also claimed that Patterson's transfer request provided him with an opportunity to further the EPA's new "SES Mobility Program," through which officials expected to transfer at least one third of senior executives as a means to counteract SES members' having become "entrenched" in their particular

positions in the EPA. For all of those reasons, Winn believed that transferring Patterson—even over Patterson's objection—was in the best interests of the EPA. See 5 U.S.C. § 3131 ("The Senior Executive Service shall be administered so as to . . . enable the head of an agency to reassign senior executives to best accomplish the agency's mission.").

To rebut EPA's justifications, Patterson raises two arguments. First, Patterson interprets Winn's expressions of irritation at the ongoing bickering between him and Davis as indicating hostility to Patterson's statutorily protected complaints of discrimination. Second, he notes his own deposition testimony recounting that Winn and other EPA officials "said that no one would be moved involuntarily" and that "[t]here would be no forced moves." J.A. 145. We will assume for the purposes of summary judgment that even a transfer precipitated by an employee's own request, but to a position not of his choosing, breached those assurances.

As to the first, it seems clear that Winn's problem was not with discrimination claims but with incessant quarreling. For months, Patterson had informed Winn of his complaints against Davis and his desire to transfer out of OAM. Indeed, Patterson provided Winn with a draft of his EEO complaint six months before the transfer, and there is no evidence that Winn objected to Patterson's filing that complaint. Instead, Winn merely expressed exasperation with his squabbling subordinates: on receiving a chain of disputatious e-mails between Davis and Patterson, seemingly calling on him to referee the fight, he forwarded it to his deputy, noting "More of the same." J.A. 657-58. Having reached his "upset quotient," he asked the deputy to "make sure this thing gets fixed. I'm spending too much of my time reading e-mails." J.A. 224. The e-mail wrangling had no racial element on its face, and Winn's express reaction shows no more than that he found it a diversion from more pressing duties.

As to the allegation that Winn broke a promise in reassigning Patterson to a post not of Patterson's choice, any such breach of promise is not in itself evidence of retaliation. Patterson doesn't argue, much less submit evidence, that promise-breaking and retaliation are correlated in such a way that one is a sign of the other. It is not enough for plaintiff to show that Winn's decision was "not just, or fair," see *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)); he must show that it was retaliatory. Although Patterson offers evidence that Winn's only other transfer under the SES mobility program moved an employee to a position of that employee's choice, the sample size is far too small to be meaningful, and Patterson concedes that SES mobility transfers by other managers were sometimes to positions the transferees did not desire. Cf. *id.* (finding no inference of pretext to be drawn from a "departure from the prescribed procedure [that] had become the norm").

Accordingly, the judgment of the district court is

*Affirmed*.